UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CARLOS RUIZ,

      Plaintiff,

v.                               Case No. 3:12cv488-LC-CJK

LIEUTENANT SHANER, *et al.*,

      Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter, filed pursuant to 42 U.S.C. § 1983, is before the court on defendants' motion for summary judgment (doc. 211) and plaintiff's response (docs. 215, 216). Having fully considered the parties' submissions, the record, and the relevant case law, the undersigned recommends defendants' motion for summary judgment be denied.

BACKGROUND

Plaintiff is an inmate of the Florida Department of Corrections currently confined at Florida State Prison.[1]  Plaintiff was confined at Santa Rosa Correctional Institution ("Santa Rosa CI") at the time of the events giving rise to his complaint. In his second amended complaint (doc. 18),[2] plaintiff names three defendants, all officials at Santa Rosa CI: Lieutenant Shaner, Correctional Officer C. Martillano, and Correctional Officer D. Carter.  (*Id.*, p. 2).  Plaintiff claims the defendants violated his rights under the Eighth Amendment when defendants Martillano and Carter assaulted him on January 5, 2012, at Shaner's request.[3]

Specifically, the complaint says Shaner confronted plaintiff, who was on his way to medical call-out, threatening plaintiff about a grievance filed the previous day.[4]  (*Id.*, p. 7).  According to plaintiff,  Shaner said "I will smoke you like I smoke

---

[1] Plaintiff is serving a life sentence for second degree murder.  (Doc. 211-1).

[2] Plaintiff filed his initial complaint on October 9, 2012 (doc. 1).  Several months later, he filed a motion to amend his complaint (doc. 5).  He then filed his first amended complaint (doc. 7).  Upon initial review of the amended complaint, the undersigned found the facts as presented failed to support a viable claim for relief under § 1983 as to one or more of the named defendants.  The undersigned provided plaintiff an opportunity to correct the deficiencies and clarify his allegations in an amended complaint.

[3] Plaintiff posits the alleged assault was in retaliation for filing grievances.  He has not, however, asserted a retaliation claim and instead relies solely on the Eighth Amendment.

[4] The grievance, plaintiff explains, "concern[ed] a prearranged (prearranged by Lt. Williams, Lt. Shaner, Sgt. Flower, and others) attempt to have another inmate to hurt plaintiff, what took place on

everybody." (*Id.*).  When medical call-out was over, Martillano and Carter began escorting plaintiff back to G-dormitory, where he was housed.  (*Id.*).  "From the beginning of being taken out of the medical building, plaintiff had a feeling that something was not right since C.O. Martillano was holding plaintiff by his left arm, something never done before, even though plaintiff had requested so on 2010 after a previous assault on plaintiff on 5/21/10 (also prearranged and paid by several officers, the cause for Case No. 3:12cv540-MCR/EMT), where plaintiff sustained severe head and bodily injuries and as a result thereof plaintiff's left side was (and still it is) numb."  (*Id.*, p. 8).

"While C.O. Martillano was holding plaintiff by his left arm," plaintiff maintains, "C.O. Carter was walking by plaintiff's right side, very close to plaintiff, so plaintiff had a feeling that something was not right."  (*Id.*).  "Then, plaintiff and his 2 officers [*sic*] escorts reached a small alley next to G-dorm – this alley has 2 Gates, one in 'front,' and one on the 'back;' also, this alley is no more than four feet wide, with fence on both sides, too.  So there is no room for any movement."  (*Id.*).  Plaintiff avers that "in a sudden move, C.O. Martillano slammed plaintiff against the concrete floor in a move meant for plaintiff to hit the concrete floor with his head,

---

1/3/12, and the cause for filing Case No. 3:12cv404-MCR/CJK."  *Id.*

either to kill plaintiff or to badly hurt him." (*Id.*).  Plaintiff "was able to twist his upper body and hit the concrete not with his head but with the upper part of his shoulder, so [his] face was on an angle facing up, and then, C.O. Carter soon joined in and, along with C.O. Martillano, started punching plaintiff, too – all the punches of C.O. Carter landing on plaintiff's left side face . . . giving plaintiff a broken nose and black eye . . . ."[5] (*Id.*, pp. 8-9).  "The meaning of Lt. Shaner's words . . . was now clear to plaintiff: Lt. Shaner had ordered it all." (*Id.*, p. 9).  "That was why plaintiff was being held by his left arm since leaving medical with C.O. Carter walking next and too close to plaintiff's right side at all time." (*Id.*).

"Then, out of nowhere, there was Lt. Shaner, holding a camera, and, as a true actor, asking 'what happened,' and C.O. Martillano stated 'He (plaintiff) spat on me,' and Lt. Shaner said 'where is the spit,' and C.O. Martillano said 'eh, I don't know,' all and everything a real show – Lt. Shaner knew exactly where the prearranged assault was going to take place: a blind spot where no camera see anything: That is why Lt. Shaner was there, without nobody calling him and only few seconds after the assault had started." (*Id.*, pp. 9-10).

---

[5] In a footnote, plaintiff states "[s]ince that day, plaintiff's left side face is lightly numb, too, since on the previous assault on plaintiff on 5/21/10, plaintiff also sustained a life threatening skull fracture on his left orbit, where C.O. Carter's punches had landed, hurting plaintiff's skull fracture, again." (*Id.*, p. 9 n.2).

"[R]ather than take plaintiff back to medical, since he was bleeding from nose and forehead, plaintiff was taken to G-dorm, where medical technician Bryant was in waiting and who just cleaned off all the blood from plaintiff's face and put some ointment all over plaintiff's face, laughing in plaintiff's face." (*Id.*, p. 10). According to plaintiff, "Lt. Shaner, officer Martillano, and officer Carter, were very conscious that their actions were not only criminal but also violatory of plaintiff's constitutional rights to be free from cruel and unusual punishment." (*Id.*). Indeed, plaintiff says, "C.O. Martillano and CO Carter (ordered by Lt. Shaner, their supervisor) knew what they were doing, and doing it with a sufficiently (and limitless) culpable state of mind, knowing full well that they were violating plaintiff's 8th amendment Constitutional right, and doing it with malice, with deliberate indifference, and with the only purpose of causing injury and pain, sadistically, and knowing that plaintiff was defenseless and that they were operating with the backup of their supervisors and with total impunity, that the DOC will condone and cover everything up. Criminals in uniform." (*Id.* pp. 10-11).

After the incident, according to plaintiff's version of events, "Lt Shaner come to plaintiff's door and asked plaintiff 'are we done.' The same question 'are we done' was also asked to plaintiff by Sgt Flower, G-dorm supervisor under Lt Shaner, also

involved in the set up to get plaintiff hurt by other inmate on 1/3/12, and what give raise to Case No. 3:12cv404-MCR/CJK." (*Id.*, p. 11). A "[f]ew days later," plaintiff says, he "was issued a bogus Disciplinary Report (D/R) for supposedly attempting to 'head butt' officer Martillano . . . ." (*Id.*). "However, plaintiff was denied the right to participate in his 'DR' hearing, all documented in several Grievances, too." (*Id.*). Plaintiff filed a grievance about the incident, which was "approved and forwarded to the DOC inspector General office 'for appropriate action' – sure meaning 'further cover up.'" (*Id.*, p. 12).

The defendants dispute plaintiff's account of the incident, insisting plaintiff attempted to pull away from Martillano and head-butt him. Martillano states in his Declaration that, as he was escorting plaintiff from an eye doctor appointment back to his assigned dormitory, plaintiff "started to pull away and attempted to head-butt [him]." (Doc. 211-2). "In order to prevent further aggression by Ruiz," Martillano says, he "placed [his] right hand on Ruiz's left upper bicep area, and positioned [his] left hand on Ruiz's upper back applying a downward pressure to place Ruiz on the ground." (*Id.*). "After placing Ruiz on the ground, Ruiz did not resist further, and all force ceased." (*Id.*).

Martillano claims he "called for additional assistance and notified Lieutenant (now Captain) William Shaner ('Lieutenant Shaner') of the incident, as he was the G-dormitory Housing Supervisor." (*Id.*). "Officer Donald Carter ("Officer Carter") then arrived and approached Ruiz to assist [Martillano] with the situation." (*Id.*). "Officer Carter and [Martillano] assisted Ruiz to his feet and . . . escorted him back to his assigned dorm so that he could be evaluated by medical." (*Id.*). "Once Ruiz entered G-dorm," according to Martillano, he and Carter "escorted [plaintiff] to the medical triage room so he could receive a post use of force medical examination." (*Id.*). The nurse who treated plaintiff documented abrasions to his right and middle forehead, a small abrasion to his cheeks and right knee, and redness on the back of his right shoulder.[6] (Doc. 211-5, p. 10). The nurse cleaned the area with peroxide and applied bacterial ointment, noting there was no edema or broken skin. (*Id.*).

Martillano "wrote a disciplinary report ("DR") charging Ruiz with violating 1-9: Assault or Attempted Assault on a Correctional Officer." (Doc. 211-2). According to Martillano, "[t]he use of force involving Ruiz was spontaneous, and only resulted due to Ruiz's attempt to attack [him]." (*Id.*). "Prior to the use of force," Martillano

---

[6] When plaintiff saw medical the next day, he complained of injuries suffered two days before the incident in question in an altercation with his cellmate; he made no mention of the incident or injuries alleged here. (Doc. 211-7).

"did not know of the grievances filed by Ruiz that he discussed in this case. [He] never spoke with Lieutenant Shaner about any grievances filed by Ruiz, nor did [the two] talk about the use of force in advance of the incident." (*Id.*).  "Ruiz's allegations to the contrary are baseless," Martillano maintains.  (*Id.*).

Carter corroborated Martillano's version of events, stating that, on January 5, 2012, he "was assigned as a Close Management Escort Officer in F-dormitory when Officer Christopher Martillano ("Officer Martillano") requested assistance behind H-dormitory resulting from a spontaneous use of force on Carlos Ruiz . . . .  Shortly after Officer Martillano requested assistance, [Carter] responded to help Officer Martillano assist Ruiz to his feet." (Doc. 211-3).  The two "then escorted Ruiz to G-dormitory where he entered the G-dormitory Medical Triage room."  (*Id.*).  "After Ruiz was done in medical, then Lieutenant, now Captain William Shaner and [Carter] escorted Ruiz back to his assigned cell and removed Ruiz's restraints." (*Id.*).  Carter claims he "did not participate in the use of force, nor was [he] present when the use of force occurred.  [He] responded to the scene and assisted in the escort of Ruiz to medical for a post use of force medical assessment."  (*Id.*).

Shaner likewise corroborated Martillano's version of events, confirming he was notified of the incident and responded to the scene.  (Doc. 211-4).  He said he was not

present when the use of force occurred.  (*Id.*).  He also said both plaintiff and Martillano "received a use of force examination following the incident," after which plaintiff was escorted back to his cell.  (*Id.*).  Shaner says he never questioned plaintiff about any grievances he filed and "had no idea force was going to be used on Ruiz."  (*Id.*).  He stated he "did not direct Martillano, or any other officer to use force on Ruiz" and "ha[d] never and would never direct an officer to use force on an inmate when it was not necessary to keep or restore order."  (*Id.*).

An FDOC incident report prepared by Robert Olson the day after the altercation corroborates defendants' version of events.  It states:

> On January 5, 2012, Officer Martillano reported that he utilized spontaneous physical force on inmate Ruiz. Inmate Ruiz was being escorted back to his assigned cell G1210 from the main unit medical building when he attempted to pull away and then attempted to head butt Officer Martillano.   Spontaneous physical force was utilized in self defense to place the inmate in a prone position on the sidewalk outside G Dorm.  The warden and EAC were notified.

(Doc. 211-5, p. 2).  Another FDOC incident report completed by Olson states essentially the same.  (*Id.*, p. 3).  The Inspector General's Office approved the FDOC's report of the incident, which is consistent with other evidence of record, including a Report of Force Used, Report of Force Used Worksheet, Incident Report,

and Charging Disciplinary Report prepared by Martillano the day of the incident. (Docs. 211-5, pp. 4-5, 12;  211-6, pp. 1-2).

Plaintiff refused to give a statement at the time of the altercation.  (Doc. 211-5, p. 16).  Five days later, however, he provided a statement saying he "did not do it." (Doc. 211-6, p. 4).  He also said "[f]irst, it is well documented that the left side of my body is numb."  (*Id.*).  "Second, on 1/3/12, I was assaulted/kicked by my roommate (documented with Grievance to the Inspector, Lt. Johnson, and central office on 1/4/12) and I had to be seen by medical for a broken rib: I can't even breathe too deep because of the pain.  See sick call request dated 1/4/12, for which I was again seen on 1/6/12."  (*Id.*).  According to plaintiff, the grievance log would "prove that this assault upon [his] person was premeditated since long ago."  (*Id.*, p. 5).  Plaintiff indicated he could not have head-butted Martillano as alleged because he was in restraints.  (*Id.*).  He also indicated he had a "black eye and nose" and that defendants planned the alleged assault in the location in which it occurred because it was "a blind spot in the compound."  (*Id.*).  Finally, plaintiff said there were witnesses to the incident.  (*Id.*).

In his response, plaintiff acknowledged he received a disciplinary report as a result of the altercation.  According to a record of the hearing on the disciplinary

report, plaintiff refused to call any witnesses.  (Doc. 211-6, p. 2).  As evidence, however, he introduced several grievances he claimed would prove the alleged assault was "premeditated."  (Doc. 211-6, pg. 7).  The committee found against plaintiff and recommended he be placed in Close Management I due to the fact he "pulled away from Officer Martillano's custodial hold and then head butted the officer."  (*Id.*).

Defendants have moved for summary judgment, arguing there is no genuine issue as to any material fact regarding plaintiff's claim, as it is supported only by plaintiff's "own conclusory, self-serving statements" which are contradicted by other evidence of record.[7]  (Doc. 211, p. 5).  Plaintiff responded with a diatribe about the defendants and attached and referenced copies of some of the voluminous and often rambling and repetitive documents he has filed in the case.[8]

---

[7] According to defendants, plaintiff is a "life-sentenced inmate" on whom "the penalties of perjury have no deterrent effect."  (Doc. 211, p. 6).  To demonstrate that fact, defendants explain "[i]f there was any doubt that the penalty of additional criminal charges would be a deterrent to Plaintiff, that doubt should have been alleviated when Plaintiff threatened the life of a magistrate judge among others, in writing, and testified during his deposition that he would not hesitate to kill another person and that he did not care about receiving an additional life sentence."  (*Id.*).

[8] For example, as exhibits, plaintiff attached the following filings: "Truth Is Light, and God Is its Fountain," "A Challenge to this Court's Conscience and Justice," "The truth – Plaintiff's Fundament, his Corner Stone," "Truth Cannot be Hidden," Irrefutable Proofs and Request for Ruling," "A uneducated alien Inmate V. Predators and Fraudulent Professionals Playing In their own arena," and "Organized Crime vs. Defenseless Inmate Plaintiff."  (Doc. 215-1).  Plaintiff also submitted grievances he filed, one of which is wholly unrelated and the other of which was filed several weeks after the incident.  (*Id.*).

Case No. 3:12cv488-LC-CJK

## DISCUSSION

A.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[T]he plain language of Rule 56(a) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to  make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law, and it is "genuine" if the record taken as a whole could lead a rational fact finder to find for the non-moving party.  *Id.*  Summary judgment is not appropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of

material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995).

When assessing the sufficiency of the evidence, the court must view all the evidence, and all factual inferences reasonably drawn therefrom, in the light most favorable to the nonmoving party. *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993). A mere scintilla of evidence in support of the nonmoving party's position, however, will not suffice to demonstrate a genuine issue of material fact and thereby preclude summary judgment. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). Moreover, "the nonmoving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative.'" *Vega v. Invsco Group, Ltd.*, 432 Fed. Appx. 867, 869-70 (11th Cir. 2011). Rather, "[o]nce a moving party identifies those portions of the record that demonstrate the absence of a genuine issue of material fact, any party opposing summary judgment must set forth specific facts showing a genuine issue for trial and may not rely on mere allegations or denials." *In re Fin. Federated Title and Trust, Inc.*, 347 F.3d 880, 885 (11th Cir. 2003).

B.   Plaintiff's Claim

A viable claim under 42 U.S.C. § 1983 requires a plaintiff to establish two essential elements: (1) the conduct complained of was committed by a person acting

under color of state law; and (2) this conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S. Ct. 1908, 1912, 68 L. Ed. 2d 420, 428 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001). Here, plaintiff alleges a violation of his Eighth Amendment rights as a result of unnecessary force.

The Eight Amendment's proscription of cruel and unusual punishment governs prison officials' use of force against convicted inmates. *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999). An Eighth Amendment excessive force claim requires an inmate to establish both a subjective and an objective component: (1) whether the "officials act[ed] with a sufficiently culpable state of mind," and (2) "if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S. Ct. 995, 999, 117 L. Ed. 2d 156 (1992) (internal quotations omitted).

Whether the subjective prong has been met depends upon whether the force "was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312,

320, 106 S. Ct. 1078, 1085, 89 L. Ed. 2d 251 (1986). To determine whether force was applied "maliciously and sadistically," courts consider the following factors: (1) "the extent of injury"; (2) "the need for application of force"; (3) "the relationship between that need and the amount of force used"; (4) "any efforts made to temper the severity of a forceful response"; and (5) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them." *Whitley*, 475 U.S. at 321, 106 S. Ct. 1078; *see also Hudson*, 503 U.S. at 7, 112 S. Ct. 995; *Campbell*, 169 F.3d at 1375 (*citing Hudson*). As the Supreme Court noted in *Whitley v. Albers*, 475 U.S. 312 (1986), when "[prison] officials [are] confronted with a prison disturbance [they] must balance the threat the unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force. Despite the weight of these competing concerns, corrections officials must make their decisions 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Id.* at 320; *see Hudson v. McMillian*, 503 U.S. 1, 112 S. Ct. 995, 999-1000 (1992).

In addition to the "unnecessary and wanton infliction of pain" standard, referred to as the "subjective component," there exists an "objective component" that determines whether the alleged wrongdoing was "objectively harmful enough to

establish a constitutional violation." *Hudson*, 503 U.S. at 8, 112 S. Ct. at 999. "The Eighth Amendment's prohibition of 'cruel and unusual' punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9-10 (*quoting Whitley*, 475 U.S. at 327). The extent of the prisoner's injury can be relevant in determining whether the force applied was *de minimis*. *Wilkins v. Gaddy*, 559 U.S. 34, 37, 130 S. Ct. 1175, 1178, 175 L. Ed. 2d 995 (2010) ("'[T]he extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation.' The extent of injury may also provide some indication of the amount of force applied." (*quoting Hudson*, 503 U.S. at 7, 112 S. Ct. 995)). However, the fact the inmate's injuries were *de minimis* does not alone render the force used *de minimis*. "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Hudson*, 503 U.S. at 9. A court ultimately should decide an excessive force claim "based on the nature of the force rather than the extent of the injury." *Wilkins*, 559 U.S. at 34, 130 S. Ct. 1175.

With regard to the subjective prong of the test, plaintiff claims Martillano and Carter assaulted him at Shaner's direction; defendants claim plaintiff assaulted Martillano and that Carter and Shaner appeared on the scene after the incident occurred.  Accepting plaintiff's version of events as true, as the court must at this stage, the subjective prong of the test is met.  Although the great weight of the evidence supports defendants' account of the incident, a genuine issue of material fact exists with regard to whether Martillano and Carter applied force unnecessarily and without provocation or whether Martillano applied force to subdue plaintiff and restore order.

The same is true with regard to Shaner's involvement, although plaintiff's claim against Shaner is certainly tenuous.  In the amended complaint, plaintiff says Shaner threatened him for filing grievances shortly before the altercation; and he references at least two comments Shaner allegedly made which he interprets as threats or acknowledgments of Shaner's role in the incident.  Although there is no direct evidence Shaner was involved, under federal law, such an inference could be drawn from the alleged comments and from Shaner's presence at the scene shortly after the incident occurred. *See, e.g., Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1323-24 (11th Cir. 1982) ("According to federal law there is no prohibition against

pyramiding inferences; instead all inferences are permissible so long as they are reasonable.").

The objective prong of the test also is satisfied for purposes of summary judgment. Plaintiff claims he had a broken nose and dislocated shoulder; the medical records reflect only abrasions to the forehead, cheeks, and right knee and redness on the back of his right shoulder. Again, under the summary judgment standard, and without regard to the weight of the evidence, a genuine issue of material fact remains. Summary judgment thus should be denied.

Accordingly, it is respectfully RECOMMENDED that defendants' motion for summary judgment (doc. 211) be DENIED.

At Pensacola, Florida this 22nd day of March, 2017.

/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.**  A copy of objections shall be served upon the magistrate judge and all other parties.  A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* U.S. Ct. of App. 11th Cir. Rule 3-1; 28 U.S.C. § 636.